IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Theodosakis, et al., | No. CV-14-02445-TUC-JAS (BPV) |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| v. | |
| Daniel O Clegg, et al., | |
| Defendants. | |

Pending before the Court are:  (1) the "Utah Defendants' Motion to Dismiss" ("MTD") (Doc. 60); and (2) Plaintiffs' Motion for Leave Amend (Doc. 75).  This matter was originally referred to the Honorable Charles R. Pyle for all pretrial proceedings and a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) and LRCiv. 72.1, 72.2, and was subsequently referred to the undersigned upon Magistrate Judge Pyle's retirement.  For the following reasons, the Magistrate Judge recommends that the District Court:  (1) grant in part and deny in part the Utah Defendants' Motion to Dismiss; and (2) grant in part and deny in part Plaintiffs' Motion for Leave to Amend.

## I.    Factual and Procedural Background

Plaintiffs Jason Theodosakis, M.D., and Supplement Testing Institute, Inc., have filed a First Amended Complaint ("FAC") (Doc. 12) naming the following Defendants: Daniel O. Clegg, M.D., Laurie Clegg; Allen D. Sawitzke, M.D.; and Domenic J. Reda, M.D.[1]   Plaintiffs allege the following claims:   defamation (Count I); commercial

---

[1] Dr. Reda has also filed a Motion to Dismiss (Doc. 55), which is addressed in a

disparagement (Count II); tortious interference with business expectancy (Count III); false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count IV); and violation of Arizona's Consumer Fraud Act, A.R.S. §44-1522 (Count V). Federal jurisdiction is asserted as based on federal question jurisdiction in light of the Lanham Act claim, and supplemental and diversity jurisdiction over the remaining claims. (FAC at ¶2). Plaintiffs' claims arise from Defendants' alleged participation in a study and the subsequent report that was published in *New England Journal of Medicine* ("NEJM")*,* that Plaintiffs claim contained false and misleading statements which damaged Plaintiffs.

On March 31, 2016, the District Court adopted two Report and Recommendations issued by Magistrate Judge Pyle: (1) setting aside the entry of default against Defendant Reda in light of Plaintiffs' failure to properly serve the United States; and (2) denying Defendants Dr. Clegg and Dr. Sawitzke's motion to dismiss on statute of limitations grounds without prejudice, and directing discovery on the statute of limitations issue. (Doc. 51).

## II.   PLAINTIFFS' ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

The parties did not object to the summary of the facts as set out in the February 9, 2016 Report and Recommendation (Doc. 50 at 3-5; *see also* Doc. 51).  Accordingly, this Court adopts that same summary as follows.

Plaintiff Supplement Testing Institute ("STI") is the producer, seller, and distributor of glucosamine and chondroitin dietary supplements, including Avosoy® Complete. (FAC ¶ 6).  In 1997, Plaintiff Dr. Theodosakis authored "The Arthritis Cure" (St. Martin's Press 1997), which allegedly first reported that osteoarthritis could be successfully treated through a nine-step treatment program that included two inexpensive over-the-counter nutritional supplements, glucosamine and chondroitin.  (*Id.* at ¶14). "The Arthritis Cure" became a New York Times #1 best seller and  Dr. Theodosakis published a subsequent book, "Maximizing the Arthritis Cure" (St Martin's Press 1998).

separate Report and Recommendation.

(*Id.* at ¶15).   Sales of the dietary supplements glucosamine and chondroitin allegedly "skyrocketed," including the dietary supplements manufactured and sold by Plaintiffs. (*Id.*).   In 1998, NIAMS, the arthritis division of the National Institute of Health ("NIH"), commissioned a grant to perform human clinical research specifically on the dietary supplements glucosamine and chondroitin.  (*Id.* at ¶17).   This study is referred to as the GAIT Glucosamine/Chondroitin Intervention Trial, or GAIT ("Study").  (*Id.*).   The Study included the use of an active comparator, celecoxib, also  known commercially as Celebrex®.  (*Id.* at ¶18).   As alleged in the FAC,

> An active comparator is commonly used in research studies to guide the validity of the research design and implementation. If the active comparator performs similarly to the bulk of the prior studies, it is an indication that the researchers designed and implemented the study correctly. If the active comparator underperforms as compared to the bulk of its prior studies, there is a high probability that the effects of treatment groups will be understated and could lead  to a false-negative result.

(*Id.* at ¶¶19-21).

The Study allegedly "compared several different treatments, including that of glucosamine, chondroitin, a combination of the two, Celebrex®, and placebo."  (*Id.* at ¶22).   The results of the Study were published in the *New England Journal of Medicine* in a report entitled, "Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis" ("Report") on February 23, 2006. (*Id.* at ¶23).   Plaintiffs allege that "Defendants (Drs. Clegg, Reda, and Sawitzke) were the lead authors of the Study and Report."[2]  (*Id.* at ¶ 25).   According to Plaintiffs' allegations, "The Report stated that Celebrex® passed the two primary outcomes, and that glucosamine and

---

[2]  The original Complaint filed on October 28, 2014 contained as an attached exhibit the report, "Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee  Osteoarthritis," published in the New England Journal of Medicine on February 23, 2006. (Doc. 1, Compl., Ex. 1). Plaintiffs' FAC filed on February 25, 2015 referred to this report as attached Exhibit 1 but the report was not attached to the FAC. (See FAC, ¶23). On June 17, 2015, Plaintiffs filed a Notice of Errata noting as an inadvertent omission that the FAC had been filed without Exhibit 1. (Doc. 41). Plaintiffs submitted with the Notice of Errata a complete copy of the FAC with Exhibit 1 attached. (Doc. 41). The Court has referred to the FAC as the pleading filed on the docket at entry number 12 and to Exhibit 1 as the attachment filed on the docket at entry number 41. "A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Rule 10(c), Federal Rules of Civil Procedure.

chondroitin, alone and in combination, were not significantly better than a placebo in reducing knee pain from osteoarthritis and do not effectively reduce knee pain from osteoarthritis." (*Id* at. ¶26).  The Study and Report allegedly "almost single-handedly changed the opinion (from positive to negative) of millions of patients and physicians around the world on the nutritional supplements glucosamine and chondroitin." (*Id*. at ¶ 27).  Plaintiffs assert that "[a]s a direct result of publication of the Study and Report, Plaintiff Dr. Theodosakis' consulting contracts with Rexall and Pharmavite were not renewed." (*Id.* at ¶ 29).

Plaintiffs allege that in the fall of 2013, Dr. Theodosakis was informed by Dr. Roy Altman, a world renowned Rheumatologist and journal editor, "that he had inadvertently been provided the raw data for the Study, and the raw data showed that the active comparator, celecoxib (Celebrex®) did not perform as stated in the Report, and in fact the raw data demonstrated that Celebrex® actually failed the two primary outcomes." (*Id.* at ¶30).  Plaintiffs allege that "[a]t all times relevant" they "did not have access to the raw data." (*Id*. at ¶32).  Dr. Altman allegedly was required to return the raw data that he had received inadvertently.  (*Id.* at ¶31). Plaintiff Dr. Theodosakis allegedly has requested that Defendants provide the raw data for the Study but it has not been provided.  (*Id.* at ¶33).  Plaintiffs allege that based on information and belief, "the statements made by the Defendants in the Report were facially false." (*Id*. at ¶34).

Plaintiffs allege that at the time the Report was published, Defendants Dr. Clegg and Dr. Sawitzke were financially involved with commercial entities that were in direct market  competition with the nutritional supplements glucosamine and chondroitin, including Plaintiffs' products.  (*Id.* at ¶¶35-38). Plaintiffs assert that they have been harmed financially and regarding their reputations by the Report which is allegedly false and misleading in several asserted ways.  (*Id.* at ¶¶ 39-49).

## III.   DISCUSSION

Defendants Dr. Clegg and Dr. Sawitzke (collectively referred to as "Defendants"), assert that the FAC should be dismissed based on Eleventh Amendment immunity and

state governmental immunity laws or, alternatively, for failure to state a claim.  Plaintiffs oppose Defendants' Motion to Dismiss (*See* Plaintiffs' Response in Opposition to Utah Defendants' Motion to Dismiss ("Plaintiffs' Opp.") (Doc. 70)), and also seek leave to file an amended complaint (Doc. 75) essentially to cure any deficiencies in the FAC in light of Defendants' Motion to Dismiss.  Defendants oppose Plaintiffs' request to amend, arguing that amendment is futile.  (Utah Defendants' Opposition. to Plaintiffs' Motion for Leave to Amend ("Defendants' Opp.") (Doc. 78)).

## A.   LEGAL STANDARDS

### 1.   DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissal is appropriate when the court lacks subject matter jurisdiction over a claim. Fed. R. Civ. 12(b)(1).   Subject matter jurisdiction involves the power of the court to hear the plaintiff's claims in the first place and, therefore, imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power. Because federal courts are courts of limited jurisdiction, it is presumed that a cause lies outside the jurisdiction of federal courts unless proven otherwise.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377  (1994).   Where the complaint fails to reflect federal jurisdiction, it must be dismissed.   *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir.1984); *see also* Fed.R.Civ.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  The plaintiff bears the burden of establishing that jurisdiction exists. *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979).

"'A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may ...'" attack the existence of subject matter jurisdiction as a matter of fact.  *National Union Fire Insur. Co. v. ESI Ergonomic Solutions, LLC.*, 342 F.Supp.2d 853, 861 (D. Ariz. 2004) (quoting *Thornhill Publishing Co.*, 594 F.2d at 733). "When a motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and

construed in the light most favorable to the nonmoving party." *Id.* (citing *Federation of African Amer. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.1996)). Where the jurisdictional issue is separable from the merits of the case, the court may consider the evidence presented with respect to the jurisdictional issue, resolving factual disputes if necessary. *Thornhill*, 594 F.2d at 733. "When the motion is a factual attack on subject matter jurisdiction, a defendant may 'rely on affidavits or any other evidence properly before the Court.'"   *National Union Fire Insur. Co.*, 342 F.Supp.2d at 861 (citing *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989)). In the instance of a factual challenge, no presumption of truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims. *Thornhill*, 594 F.2d at 733.

When a motion to dismiss is based on more than one ground, the court should consider the Rule 12(b)(1) challenge first because the other grounds will become moot if the court lacks subject matter jurisdiction. 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure,* § 1350 (3d ed.).

## 2. DISMISSAL FOR FAILURE TO STATE A CLAIM

"'To survive a motion to dismiss [under Fed.R.Civ.P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face;' that is, plaintiff must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Telesaurus VPC, LLC. v. Power,* 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Moss v. United States Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009) (for a complaint to defeat a motion to dismiss, the "non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."). Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990), *abrogated on other grounds by Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007).

When analyzing a complaint for failure to state a claim, the court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Taylor v. Yee,* 780 F.3d 928, 935 (9th Cir. 2015) (internal quotation marks and citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint..." does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678; *see also Telesaurus*, 623 F.3d. at 1003 (pleadings that are no more than legal conclusions "'are not entitled to the assumption of truth.'") (quoting *Iqbal*, 556 U.S. at 679). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, the court "cannot assume any facts necessary to [the plaintiffs']...claim that they have not alleged." *Jack Russell Terrier Network of Northern Calif. v. American Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005).

However, the court will assume "'well-pleaded factual allegations,'. . . to be true, 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Telesaurus*, 623 F.3d. at 1003 (quoting *Iqbal*, 556 U.S. at 679); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 570). Determining plausibility is a "context-specific task..." that requires the court to "draw on its judicial experience and common sense." *Id.* at 679. A complaint cannot survive dismissal where the court can only infer that a claim is merely possible rather than plausible. *Id.*

Although courts will not normally look beyond the pleadings in resolving a Rule 12(b)(6) motion, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001), *impliedly overruled on other grounds as discussed in Gallardo v. Dicarlo,* 203 F.Supp.2d 1160, 1162 n.2 (C.D. Cal. 2002), the court may consider material that the plaintiff properly

1  submitted as part of the complaint or, even if not physically attached to the complaint,

2  material that is not contended to be inauthentic and that is necessarily relied upon by the

3  plaintiff's complaint. *Id.* A court may disregard allegations of the complaint that are

4  contradicted by attached exhibits. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295

5  (9th Cir.1998); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir.1987).

6  Here, Plaintiffs attached to their original complaint the Report published in the NEJM.

7  (Complaint (Doc. 1), Exh. 1).  The Court will consider the Report published in the NEJM

8  in resolving Defendants' Motion to Dismiss.

### 3.    AMENDMENT OF THE COMPLAINT

10       The Federal Rules of Civil Procedure provide that "the court should freely give

11  leave [to amend the complaint] when justice so requires[,]" Fed.R.Civ.P. 15(a)(2), and

12  the United States Supreme Court has made clear that "this mandate is to be heeded."

13  *Foman v. Davis*, 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances

14  relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an

15  opportunity to test his claim on the merits." *Id.*  However, leave to amend may be denied

16  in circumstances of undue delay, bad faith, futility of amendment, failure to cure

17  deficiencies by amendments previously allowed, and prejudice to the opposing party. *Id.*;

18  *Western Shoshone Nat'l Council v. Molini,* 951 F.2d 200, 204 (9th Cir. 2001); *Howey v.*

19  *United States*, 481 F.2d 1187 1190 (9th Cir.1973). The most important of these factors is

20  prejudice to the opposing party.  *Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th

21  Cir. 1990). The party opposing amendment bears the burden of proving prejudice.  *DCD*

22  *Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).  A district court's denial

23  of leave to amend is reviewed for an abuse of discretion, but the question of futility is

24  reviewed de novo.  *United States v. United Healthcare Insur. Co.,* __ F.3d __, 2016 WL

25  7378731 *7 (9th Cir. Aug. 10, 2016).

26       Additionally, the Ninth Circuit has made clear "that in dismissals for failure to

27  state a claim, a district court should grant leave to amend even if no request to amend the

28  pleading was made, unless it determines that the pleading could not possibly be cured by

1    the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern Calif. Collection*

2    *Serv. Inc.,* 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

3            **B.    ELEVENTH AMENDMENT IMMUNITY**

4            Defendants assert that at all times during the course of the GAIT Study and

5    publication of the Report in the NEJM, they were each members of the faculty of the

6    University of Utah School of Medicine and employees of the University of Utah.  (MTD

7    at 2; "Exhibit List and Exhibits to Utah Defendants' Reply in Support of Utah

8    Defendants' Motion to Dismiss" (Doc. 77) Exhs. A, B).  Defendants point out that the

9    Report identifies them "as 'from the University of Utah School of Medicine, Salt Lake

10   City' and acknowledges the University of Utah as the coordinating center of the GAIT

11   study."  (MTD at 2 (citing the Report)).  They argue that they are named defendants

12   because of the GAIT study they administered as employees and agents of the University

13   of Utah Medical School, which is an arm of the State of Utah.  (MTD at 4).  Because

14   suits against state officials in their official capacity are treated as a suit against the state

15   itself, they contend that Plaintiffs' action is barred under the Eleventh Amendment.  (*Id.*).

16   Defendants bear the burden of establishing that they are immune from suit.  *See ITSI TV*

17   *Productions, Inc. v. Agricultural Associates,* 3 F.3d 1289, 1292 (9th Cir. 1993).

18           Plaintiffs counter that the FAC does not allege that Defendants are sued in their

19   official capacity and the Eleventh Amendment does not bar actions against state officials

20   who are sued in their individual capacity.  (Plaintiffs' Opp. at 3).  Nor do Plaintiffs seek

21   damages against the State of Utah.  (*Id.*).

22           Under the Eleventh Amendment, "'an unconsenting State is immune from suits

23   brought in federal courts by her own citizens as well as by citizens of another state.'"

24   *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984) (quoting

25   *Employees v. Missouri Public Health & Welfare Dep't,*   411 U.S. 279, 289 (1973),

26   *superseded on other grounds by statute*).  Because the State of Utah is not named as a

27   defendant, the issue here is whether this action, which is brought against state employees,

28   "is a suit against the State itself."  *Id.* ("When the suit is brought only against state

officials, a question arises as to whether the suit is a suit against the State itself."); *see also Central Reserve Life of No. Amer. Ins. Co. v. Struve,* 852 F.2d 1158, 1160 (9th Cir. 1988) ("It is well settled that a state need not be named as a party to an action in order for that action to be barred by the [E]leventh [A]mendment.") (citation omitted).  "Where the state is in fact the real party in interest, the [E]leventh [A]mendment precludes a district court from exercising jurisdiction over the claims presented even though only state officials have been named as party defendants."  *Central Reserve Life of No. Amer. Ins. Co.,* 852 F.2d at 1160-61 (citing *Pennhurst,* 465 U.S. at 101).  A state is deemed to be the real party in interest where the plaintiff is seeking to impose a liability that must be paid from public funds in the state treasury, *Hafer v. Melo,* 502 U.S. 21, 30 (1991), "where 'the judgment sought would. . .  interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'"  *Central Reserve Life of No. Amer. Ins. Co.,* 852 F.2d at 1161 (quoting *Demery v. Kupperman,* 735 F.2d 1139, 1146 (9th Cir. 1984)).  If the State is not a real party in interest, then,

> a suit against a government official in his or her personal capacity cannot lead to imposition of fee liability upon the governmental entity. A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him. Indeed, unless a distinct cause of action is asserted against the entity itself, the entity is not even a party to a personal-capacity lawsuit and has no opportunity to present a defense.

*Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985).

Additionally, "[t]he Supreme Court has noted on numerous occasions that state officials cannot invoke state sovereign immunity under the [E]leventh [A]mendment simply because they committed a tort in the course of their employment."  *Ronwin v. Shapiro,* 657 F.2d 1071, 1074 (9th Cir. 1981) (suit for libel against authors and editor of a law review note was not barred by Eleventh Amendment) (citing *Hopkins v. Clemson College,* 221 U.S. 636, 642-43 (1911) ("The Eleventh Amendment was not intended to afford [public agents] freedom from liability in any case where, under color of their office, they have injured one of the states' citizens."); *Scheuer v. Rhodes,* 416 U.S. 232,

238 (1974) ("damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office."), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800 (1982)).

Here, the FAC is silent as to whether the Utah Defendants are sued in their individual or official capacities. The FAC can plainly be read that Defendants Dr. Clegg and Dr. Sawitzke are sued in their individual capacity, especially given that there is no mention the University of Utah. Plaintiffs assert that their intent is to sue these Defendants in their individual capacity and to that end, Plaintiffs have filed a motion to amend the FAC to clarify that they are suing Dr. Clegg and Dr. Sawitzke in their individual capacities only. Moreover, Defendants have not demonstrated that the relief sought in this matter if Plaintiff is successful would come from the state coffers[3], interfere with the public administration, or compel the State of Utah to act or restrain from acting.

It is Defendant's burden to establish that they are entitled to immunity under the Eleventh Amendment. *See ITSI TV Production, Inc.,* 3 F.3d at 1292. On the instant

---

[3] For example, the Ninth Circuit has declined to find that the state of California was a real party in interest for purposes of the Eleventh Amendment where the state had enacted a statute essentially indemnifying public employees in certain circumstances. *Demery,* 735 F.2d 1147-48. ("We are . . . unable to accept the proposition that a state may extend sovereign immunity to state officials merely be enacting a law assuming those officials' debts."). The *Demery* court explained:

> When, as here, the state's obligation to pay damages derives not from the nature of plaintiff's claim, but from an entirely collateral, voluntary undertaking on the part of the state, the federal court is in no way exerting power over the state or the state's treasury. If plaintiff prevails on the merits, the court will not be ordering the state to do anything; it will only be ordering the *official* to pay damages. If the state official desires indemnification under the state statute, he must bring suit in a state court. . . . And if plaintiff prevails in his suit against the officials, any suit by him seeking to enforce his award against the state in federal court would be barred by the eleventh amendment.

*Id.* at 1148 (emphasis in original) (internal citations omitted). *See also Ronwin,* 657 F.2d at 1074 (no immunity where "[f]unds from the State of Arizona are potentially involved in this case only if the State has voluntarily assumed the obligation of covering such risks under its indemnification program.").

1  record, Defendants have not made a sufficient showing that would support the conclusion

2  that they are entitled to Eleventh Amendment immunity.   Consequently, Defendants'

3  motion to dismiss based on Eleventh Amendment immunity should be denied.[4]

4        **C.   STATE GOVERNMENTAL IMMUNITY AND NOTICE REQUIREMENTS**

5        Citing comity concerns, Defendants Dr. Clegg and Dr. Sawitzke urge the Court to

6  apply Utah's governmental immunity statute under which the State of Utah, its agencies

7  and "'each employee of a governmental entity'" are immune from suit for any injury that

8  results from exercise of a governmental function."[5]   (MTD at 5 (quoting U.C.A.§ 63G-7-

9  201(1); *see also id.* ("The Act governs all 'claims' against governmental employees . . .

10  arising out of the performance of the employee's duties, within the scope of employment,

---

[4] It is arguable that even if Defendants Dr. Clegg and Dr. Sawitzke had been entitled to immunity, they, nonetheless, waived it. "Sovereign immunity is quasi-jurisdictional in nature. It may be forfeited where the state fails to assert it and therefore may be viewed as an affirmative defense." *In re Bliemeister,* 296 F.3d 858, 861 (9th Cir. 2002). Here, Defendants did not raise the issue until after the Court denied their motion to dismiss on statute of limitations grounds and directed the parties to conduct discovery on the limitations issue. A defendant's delay in raising Eleventh Amendment immunity until after it had unsuccessfully argued other matters can be viewed as "undermin[ing] the integrity of the judicial system[,]. . ." so as to result in waiver of any sovereign immunity [the defendant] had available. *Id.* (state waived sovereign immunity where it first filed a limited response contending that a determination of dischargeability must be made in an adversary proceeding, answered the complaint, filed a motion for summary judgment and heard the court announcing its preliminary leanings which were unfavorable to the state). Although Plaintiffs mentioned that Defendants did not raise the immunity "by the prior pleadings" (Plaintiffs' Motion for Leave to Amend at 2), Plaintiffs did not expressly argue waiver and the parties have not had the opportunity to brief the waiver issue. In any event, as discussed above, Defendants have not shown that the Eleventh Amendment bars this action.

Additionally, although the Court has determined in a separate Report and Recommendation that Defendant Dr. Reda was working in his official capacity at the relevant time, the analysis with regard to Dr. Reda under the Westfall Act is different from the analysis applicable here.

[5] Pursuant to Utah statute:
(a) "Governmental function" means each activity, undertaking, or operation of a governmental entity.
(b) "Governmental function" includes each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a governmental entity.
(c) "Governmental function" includes a governmental entity's failure to act. U.C.A. § 63G-7-102(4).

1
2
or under color of authority." (citing U.C.A. § 63G-7-101(2)(b)).   Further, Utah statute requires:

3
4
5
6
> Any person having a claim[6] against a governmental entity, or against its employee for an act or omission occurring during the performance of the employee's duties, within the scope of employment, or under color of authority shall file a written notice of claim with the entity before maintaining an action, regardless of whether or not the function giving rise to the claim is characterized as governmental.

7
8
9
10
11
12
U.C.A. § 63G-7-401(2).   Any such claim "is barred unless notice of claim is filed…according to the requirements of Section 63G-7-401 within one year after the claim arises regardless of whether or not the function giving rise to the claim is characterized as governmental."  U.C.A. § 63G-7-402.  Under Utah law, "[f]ailure to comply with the [notice of claim provision] requirements. . . deprives a court of subject matter jurisdiction. . . ."  *Greene v. Utah Transit Auth.,* 37 P.3d 1156, 1160 (Utah 2001).

13
14
15
16
17
Defendants stress that they are both employees of the University of Utah and are sued for performing their duties within the scope of their employment.  They assert that the matter should be dismissed because Plaintiffs did not file a claim pursuant to Utah's statutory requirement and any claim submitted at this point would be untimely. (*See* MTD at 6-7 (citing MTD, Exh. 1)).

18
19
20
21
22
Plaintiffs argue that the Utah statutory scheme does not apply because their claims are governed by Arizona law. (Plaintiffs' Opp. at 4).  Plaintiffs also argue that the Utah law would not apply because the FAC does not allege that Defendants' actions at issue arose out of their performance of public duties or within the scope of employment.  (*Id.*).  Plaintiffs also point out that the statutes do not apply to allegations that defendants acted

23
24
25
26
27
28
---

6 A "claim" under the statute:
> means any asserted demand for or cause of action for money or damages, whether arising under the common law, under state constitutional provisions, or under state statutes, against a governmental entity or against an employee in the employee's personal capacity.

U.C.A. § 63G-7-102(1).

through fraud or malice, which is alleged here, nor do they apply to equitable claims and the complaint seeks an equitable remedy of retraction of the Study.  (*Id.* at 4-5).

The U.S. Supreme Court has recognized "that the Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Franchise Tax Bd. of Calif. v. Hyatt,* (*Franchise I*) 538 U.S. 488, 494 (2003) (quoting *Sun Oil Co. v. Wortman,* 486 U.S. 717, 722 (1988)).  *Cf. Nevada v. Hall,* 440 U.S. 410, 425-26 (1979) ("In the past, this Court has presumed that the States intended to adopt policies of broad comity toward one another.  But this presumption reflected an understanding of state policy, rather than a constitutional command. . . .It may be wise policy, as a matter of harmonious interstate relations, for States to accord each other immunity or to respect any established limits on liability.  They are free to do so.").  Moreover, in a case where a Nevada resident brought suit in Nevada state court against a California state agency, the Supreme Court approved of Nevada's application of its own immunity law, instead of California's, as consistent with the Full Faith and Credit Clause, emphasizing

> both that (1) the Clause does not require one State to apply another State's law that violates its "own legitimate public policy," *Franchise Tax Bd., supra,* at 497–498, 123 S.Ct. 1683 (citing *Hall,* supra, at 424, 99 S.Ct. 1182), and (2) Nevada's choice of law did not "exhibi[t] a 'policy of hostility to the public Acts' of a sister State." *Franchise Tax Bd.,* supra, at 499, 123 S.Ct. 1683 (quoting *Carroll v. Lanza, supra,* at 413, 75 S.Ct. 804). Rather, Nevada had evinced "a healthy regard for California's sovereign status," we said, by "relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis." *Franchise Tax Bd., supra,* at 499, 123 S.Ct. 1683.

*Franchise II,* __ U.S. __, 136 S.Ct. 1277, 1282 (2016).

In arguing for application of Utah's governmental immunity statutes, Defendants do not discuss the precise contours of Utah's statutory scheme.  Nor do they suggest that Arizona provides for as broad a scope of governmental immunity as Utah apparently does.  Defendants also have not suggested that they would qualify for immunity under Arizona's statutes.   Arizona appears to provide absolute immunity in certain circumstances to public entities engaged in specific functions, A.R.S. §12-820.01, and

- 14 -

qualified immunity for specified acts of public employees acting within the scope of the public employee's employment, unless the employee intended to cause injury or was grossly negligent, A.R.S. § 12-820.02.[7]   When enacting its governmental immunity scheme, the Arizona "legislature affirmed the settled notion that governmental immunity from tort liability 'is the exception and liability the rule.'" *Dominguez v. Shaw,* 2011 WL 6297971 *2 (D. Ariz. Dec. 16, 2011) (quoting *City of Tucson v. Fahringer,* 164 Ariz.

---

[7] Pursuant to A.R.S. § 12-820.02:

A. Unless a public employee acting within the scope of the public employee's employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for:

    1. The failure to make an arrest or the failure to retain an arrested person in custody.

    2. An injury caused by an escaping or escaped prisoner or a youth committed to the department of juvenile corrections.

    3. An injury resulting from the probation, community supervision or discharge of a prisoner or a youth committed to the department of juvenile corrections, from the terms and conditions of the prisoner's or youth's probation or community supervision or from the revocation of the prisoner's or youth's probation, community supervision or conditional release under the psychiatric security review board.

    4. An injury caused by a prisoner to any other prisoner or an injury caused by a youth committed to the department of juvenile corrections to any other committed youth.

    5. The issuance of or failure to revoke or suspend any permit, license, certificate, approval, order or similar authorization for which absolute immunity is not provided pursuant to § 12-820.01.

    6. The failure to discover violations of any provision of law when inspections are done of property other than property owned by the public entity in question.

    7. An injury to the driver of a motor vehicle that is attributable to the violation by the driver of § 28-693, 28-1381 or 28-1382.

    8. The failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under any federal law or any law of this state.

    9. Preventing the sale or transfer of a handgun to a person who may lawfully receive or possess a handgun.

    10. The failure to detain a juvenile taken into temporary custody or arrested for a criminal offense or delinquent or incorrigible act in the appropriate detention facility, jail or lockup described in § 8-305.

    11. An injury caused by a peace officer if the injury was caused by any act or omission while rendering emergency care at the scene of an emergency occurrence.

B. The qualified immunity provided in this section applies to a public entity or public employee if the injury or damage was caused by a contractor's employee or a contractor of a public entity acting within the scope of the contract. The qualified immunity provided in this section does not apply to the contractor or the contractor's employee.

- 15 -

599, 600 n.4, 795 P.2d 819, 820 (1990)).  In Arizona, "[p]ersons who have claims against a . . . public employee. . ." must file a claim within 180 days after the cause of action accrues.  A.R.S. § 12-821.01 (setting out information required to be stated in the claim).

The State of Arizona, like the State of Nevada in *Franchise I,* "is undoubtedly 'competent to legislate' with respect to the subject matter of the alleged intentional torts here, which, it is claimed, have injured one of its citizens within its borders." *Franchise I,* 538 U.S. at 494 (internal quotation marks and citation omitted).  *See also Dominguez,* 2011 WL 6297971 at *2 ("The Arizona Supreme Court explicitly recognized the legislature's constitutional authority to direct the manner in which actions may be brought against the state.") (citing *Clouse ex rel. Clouse v. State,* 199 Ariz. 196, 203, 16 P.3d 757, 764 (2001)).  Defendants have not disputed that Arizona law governs Plaintiffs' claims.  Defendants Dr. Clegg and Dr. Sawitzke, Plaintiffs, and the Court have applied Arizona statutes of limitations in this case, (*see* Docs. 30, 33, 50, 51) and Defendants apply Arizona law in the instant MTD when arguing that Plaintiffs fail to state a claim. Arizona, like Nevada in *Franchise I*, "certainly has an interest in protecting its citizens from injurious intentional torts . . . committed by sister states' government employees'" and this interest "should be accorded greater weight than . . .", than Utah's policy favoring broader immunity.  *Franchise* I, 538 U.S. at 493-94 (internal quotation marks and citation omitted); *See also id.* at 499 (stating that such considerations indicated that "[t]he Nevada Supreme Court sensitively applied principles of comity with a healthy regard for California's sovereign status, relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis.").  Thus, if any state governmental immunity statute applies to this action, it should be Arizona's.

Defendants have not shown how Arizona's governmental immunity statute would necessarily preclude suit.  They essentially appear to rely on the governmental immunity statutes to show that Plaintiffs failed to file a timely notice of claim, which they contend is a prerequisite to filing the instant action.  In Utah, Plaintiffs had one year from the accrual of their cause of action to file a claim.  In Arizona, they had 180 days.  Both

notice of claim statutes on their face involve a claim for money damages.  *See* U.C.A. §63G-7-102(1), A.R.S. §12-820.01 (requiring statement of a "specific amount" for which the claim can be settled); *see also Martineau v. Maricopa County,* 207 Ariz. 332, 85 P.2d 912, (App. 2004) (claim notice statutes did not apply as a prerequisite to maintaining declaratory judgment action), and Defendants do not rebut Plaintiffs' argument that the notice of claim statutes would not apply to Plaintiffs' requests for injunctive relief. Arizona's interest in a prompt notice and attempt at resolution of claims against one's government supports application of Arizona's 180-day notice requirement in this case. Regardless, even if Utah's more generous deadline applied, the fact remains that Plaintiffs have not indicated that they filed a notice in either state.  Instead, Plaintiffs argue that they were not required to file a notice of claim because Defendants were not acting as public employees in the scope of their employment with the University of Utah during the events giving rise to this action.  Plaintiffs also seek to amend the FAC to allege that Defendants' alleged actions were not made "in any official capacity for the State of Utah." (Proposed Second Amended Complaint ("PSAC") (Doc.75-1) at ¶24).

To support their assertion that their work on the Study was performed within the scope of their public employment, Defendants Dr. Clegg and Dr. Sawitzke attach their own declarations stating as much to their Reply to Plaintiffs' Opposition to their Motion to Dismiss (Doc. 76) at Exhs. A & B (Docs. 77-1, 77-2).  The District Court for the District of Arizona has treated motions seeking dismissal for failure to comply with Arizona's notice of claims statute as a motion to dismiss under Rule 12(b)(6).  *See Nored v. City of Tempe,* 614 F.Supp.2d 991, 994-95 (D. Ariz. 2008); *McGrath v. Scott,* 250 F.Supp.2d 1218, 1236 (D. Ariz. 2003).  In resolving a Rule 12(b)(6) motion, the court may not consider matters outside the pleadings, such as Dr. Clegg's and Dr. Sawitzke's declarations, unless the motion is treated as one for summary judgment.  In similar circumstances, the District of Arizona has denied the motion to dismiss with leave to refile as a motion for summary judgment in due course.  *McGrath,* 250 F.Supp.2d at 1236.  Likewise, dismissal with leave to refile as a motion for summary judgment is the

proper course in this action for several reasons.   First, Defendants attached the declarations to their Reply, and such practice is disfavored.  *See Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir. 1996).  Second, Plaintiffs have requested discovery on the issue and have alleged that: the Study was not funded by the State of Utah (PSAC at ¶21); Defendants Dr. Clegg and Sawitzke "republished" the alleged false statements, which brings into question whether the republications were made within the scope of their public employment (*id.* at ¶¶37, 38)[8]; and during the relevant time both Dr. Clegg and Dr. Sawitzke reported financial involvement with the maker of Celebrex®, and Dr. Clegg reported financial involvement with some of Plaintiffs' other competitors, as well.  (*id.* at ¶¶49-51; *see also* FAC at ¶¶35-37).  Delaying consideration of the matter until it can be properly addressed in the context of a summary judgment motion after time for discovery is appropriate in these circumstances.  Delaying consideration of this matter does not expose Defendants to a suit that might have otherwise been precluded had the notice of claim issue been resolved at this time because, as discussed above, Defendants have not established that they would be immune from suit under Arizona law nor have they shown that Plaintiffs' failure to file a notice of claim would vitiate Plaintiffs' requests for injunctive relief.[9]

Moreover, Defendants have opposed Plaintiffs request to amend the FAC on the ground that any amendment would be futile.  (*See* Defendant's Opp. (Doc. 78)).  However, because Defendants have failed to establish that they are being sued in their

---

[8] As discussed *infra*, Plaintiffs' Motion for Leave to Amend should be granted in part to the extent that they seek to add these allegations.

[9] The Court recognizes that *Nored* also discussed the possibility that the motion is more properly filed under Rule 12(b)(1) in light of inconsistent Arizona case law on the matter.  *See Nored,* 614 F.Supp.2d at 994 n.3.   While Rule 12(b)(1) allows for consideration of documents outside the pleadings, Defendants did not submit their declarations until they filed their Reply.  Not only is new evidence filed with a reply brief disfavored, *Provenz,* 102 F.3d at 1483, but as discussed above, Defendants have not shown they would be immune under Arizona law and there is still a question as to whether "republication" of the false statements as claimed by Plaintiffs was done within the scope of Defendants' public employment, which would preclude dismissal at this time without further discovery.

official capacity only, there is no showing at this point that Plaintiffs' request to amend the FAC to allege that Defendants are sued solely in their individual capacity is futile. Consequently, Plaintiffs should be permitted to amend the FAC to include allegations to support their position that Defendants Dr. Clegg and Dr. Sawitzke are sued in their individual capacity.

### D.   FAILURE TO STATE A CLAIM

Defendants argue that Plaintiffs' FAC should be dismissed for failure to state a claim on all counts.  Defendants assert that that Plaintiffs' request for leave to amend should be denied as futile because the proposed amendments also fail to state a claim for relief.[10]

### 1.   COUNT I: DEFAMATION

In relevant part, Plaintiffs allege in their FAC that:

● "Defendants' false statements have prejudiced Plaintiffs and are harmful to the continued business operations of Plaintiffs and Plaintiff Theodosakis' reputation." (FAC at ¶54);

● "Defendants' false statements have prejudiced Plaintiffs in the public estimation by casting aspersion on the effectiveness of Plaintiffs' products." (*id.* at ¶56);

● "Defendants' false statements have caused special damages to Plaintiffs, by impairing and impinging the reputation of its products and their value to Plaintiffs' customers and potential customers." (*id.* at 58).

Defendants assert that "[a]side from acknowledging [Dr. Theodosakis] as a participating investigator and member of the GAIT study steering committee, the report does not mention Dr. Theodosakis." (MTD at 3).  Defendants also point out that the

---

[10] Defendants also contend that Plaintiffs should not be permitted to file a second amended complaint because their claims are barred by the statute of limitations. However, that issue remains to be resolved in light of the District Court's denial of Defendants' motion to dismiss raising the limitations issue.  (Doc. 51).  The District Court has directed discovery to proceed on the limitation issue, which is presently ongoing.  (*Id.*).

"reported findings concern[ed] glucosamine and chondroitin, generic compounds naturally made in humans." (*Id.* at 10) (footnote omitted).   According to Defendants, "casting aspersions on generic ingredients used in Plaintiffs' (and thousands of other) products is not enough to state a plausible claim for defamation under Arizona law." (*Id.* at 10-11).

To state a claim for defamation, Plaintiffs must allege that Defendants published a false and defamatory communication concerning Plaintiffs, knowing that the statement was false, acting in reckless disregard of whether the statement was true or false, or acting negligently in failing to ascertain the truth or falsity of the statement.  *Reynolds v. Reynolds,* 231 Ariz. 313, 317, 294 P.3d 151, 155 (App. 2013).  "'To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation.'" *Dube v. Likins,* 216 Ariz. 406, 418, 167 P.3d 93, 105 (App. 2007) (quoting *Turner v. Devlin,* 174 Ariz. 201, 203–04, 848 P.2d 286, 288–89 (1993)).   The determination "[w]hether a statement is capable of defamatory meaning is a question of law for the court, but whether the meaning conveyed was defamatory is a question for the jury.'" (*Id.*) (citation omitted).

Defendants correctly point out that a corporation, like STI, "has no personal reputation and may be libeled only by imputation about its financial soundness or business ethics." *Seitz v. Rheem Mfg. Co.,* 544 F.Supp. 2d 901, 907-08 (D. Ariz. 2008). Plaintiffs have neither alleged nor argued that the statements at issue concerned such matters with regard to STI.  The FAC fails to state a claim of defamation as to STI.  *See id.*

With regard to Dr. Theodosakis, there is no dispute that the Report only mentions him when acknowledging him as a participating investigator and member of the GAIT study steering committee.  "To be actionable defamatory statements must be published in such a manner that they reasonably relate to specific individuals." *Hansen v. Stoll,* 130 Ariz. 454, 458, 636 P.2d 1236, 1240  (App. 1981)   However, "[i]t is not necessary for

the defamatory statement to mention the plaintiff by name so long as there is such a description of or referring to the plaintiff that those who hear or read the statement understand the plaintiff to be the subject of the statement." *Seitz,* 544 F. Supp. 2d at 907 (citing *Hansen,* 130 Ariz. at 458, 636 P.2d at 1240; Restatement (Second) of Torts § 564 cmt b (1977)). Dr. Theodosakis bears the burden of establishing "that the publication was 'of and concerning' him." *Hansen,* 130 Ariz. at 458, 636 P.2d at 1240 (citations omitted).

The Report includes comments such as:

● "Glucosamine and chondroitin sulfate are used to treat osteoarthritis." (Report at 795);

● "The dietary supplements of glucosamine and chondroitin sulfate have been advocated, especially in the lay media, as safe and effective options for the management of symptoms of osteoarthritis." (*id.* at 796);

● "We conducted the [Study] . . . to evaluate rigorously the efficacy and safety of glucosamine, chondroitin sulfate, and the two in combination in the treatment of pain due to osteoarthritis of the knee." (*id.; see also id.* at 806);

● "Glucosamine and chondroitin sulfate are the most widely used dietary supplements for osteoarthritis, with estimated sales in 2004 approaching $730 million." (*id.* at 806) (footnote omitted);

● "In the United States, glucosamine and chondroitin sulfate are considered dietary supplements and are not held to the stringent standards of pharmaceutical manufacture. If these agents are to be widely used for the treatment of osteoarthritis, serious consideration must be given to their current regulatory status in order to ensure potency and purity. Studies have demonstrated substantial variation between the content listed on the labels of these products and the actual content. Because our study was conducted under pharmaceutical rather than dietary-supplement regulations,

agents identical to the ones we used may not be commercially available." (*id.* at 807 (footnotes omitted); *see also id.* at 797);

● "In making therapeutic decisions, physicians and patients alike should be aware of our data suggesting that celecoxib has a much faster time to response than glucosamine, chondroitin sulfate, or the two in combination. Continuing research is needed to establish the potential efficacy and increase our understanding of the biology, pharmacology, and pharmacokinetics of these agents." (*id.* at 807).

Dr. Theodosakis argues that the Report relates to him because he wrote the bestselling book that "first reported that osteoarthritis could be successfully treated through a nine-step treatment program, which included two inexpensive over-the-counter nutritional supplements—glucosamine and chondroitin." (FAC at ¶¶14 (*see also id.* at 15 (Dr. Theodosakis went on to write and publish "Maximizing the Arthritis Cure" prior to the Study)).  Plaintiffs go on to allege that "[t]he popular press took notice as well and published numerous articles on the books and nutritional supplements glucosamine and chondroitin. . . ."  (FAC at ¶16).  Plaintiffs contend that it was the success of the supplements that led to the Study.  (Plaintiffs' Opp. at 7 (citing FAC at ¶18); *see also* FAC at ¶17).  Dr. Theodosakis asserts that because his "name was virtually synonymous with the dietary supplements glucosamine and chondroitin", the Report was "reasonably related to" and "of and concerning" him.  (Plaintiffs' Opp. at 7; *see also id.* ("Due to the universal recognition of the relationship between these supplements and Dr. Theodosakis, it cannot be doubted that the false statements related directly to and were of and concerning [him].")).

Plaintiffs' FAC acknowledges that "[t]he popular press. . .published numerous articles. . ." not only about Dr. Theodosakis' book, but also about the supplements as well.  (FAC at ¶16).  The Report acknowledged as much when it recognized that the supplements had been advocated "especially in the lay media, as safe and effective options. . . ."  (Report at 796).  At best, any alleged defamation occurred with regard to a

group.  "When a group of persons are defamed, the statements must reasonably relate to a certain individual member or members. . . . If the group is so large, or the statements so indefinite, that the objects of the defamatory statements cannot readily be ascertained, the statements are not actionable."  *Hansen,* 130 Ariz. at 458, 636 P.2d at 1240.  This is not an insurmountable showing, however, because "[i]t is not necessary to prove that every reader could make the connection, as publication to any individual will suffice. . . But the connection must be reasonable under the circumstances."  (*Id.* at 459, 636 P.2d at 1241) (on facts presented, "[t]he question of identification [was] for the jury to decide.").  The allegations plausibly suggest that Dr. Theodosakis publicly and on a nationwide scale staked his reputation on his position that glucosamine and chondroitin play a major role in treating osteoarthritis and that Defendants' alleged false statements at issue impeached Dr. Theodosakis reputation.  As such, the claim is adequately pled to survive a motion to dismiss.  Defendants' reliance on *Texas Beef Group v. Winfrey,* 11 F.Supp.2d 858 (N.D. Tex 1998) does not alter this analysis as that case was decided on a motion for judgment as a matter of law at the close of the plaintiffs' case and not at the Rule 12(b)(6) stage.

## 2.   COUNT II:  COMMERCIAL DISPARAGEMENT

Defendants assert that Plaintiffs fail to state a claim because the Report does not mention Plaintiffs' products.  (MTD at 11).

Commercial disparagement "involves the intentional publication of an injurious falsehood disparaging the quality of another's property with resulting pecuniary loss."  *Gee v. Pima County,* 126 Ariz. 116, 612 P.2d 1079 (App. 1980); *see also Seitz,* 544 F.Supp. 2d at 909 (product disparagement claim survived motion to dismiss where "[c]onsidering Plaintiffs' status as the inventor of the electric tankless water heater, reasonable minds could find that the general statements about electric tankless water heaters were directed at Plaintiffs' products.").  As with a claim of defamation, the statement at issue must "reasonably relate to" or be "of and concerning" the Plaintiffs.  *See Seitz,* 544 F.Supp. 2d at 907-09; Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts § 656* (2d ed.).

- 23 -

In relevant part, Plaintiffs allege in the FAC that:

● "On information and belief, the Report contains false statements about the Study's outcomes for the supplements used in Plaintiffs' products, and Defendants' Report simultaneously made false statements about the Study's outcomes for Celebrex®." (FAC at ¶40);

● "On information and belief the Report is false and misleading because the raw data does not support the statements made in the Report regarding the Study's outcomes including the statements that the supplements in Plaintiffs' products performed unsuccessfully in the Study or that Celebrex® performed successfully in the Study." (FAC at ¶41)

● "The publication of the Report disparaged the nutritional supplements glucosamine and chondroitin, including Plaintiffs' products containing same, and Plaintiffs' reputations." (*id.* at ¶43);

● "On information and belief, the results stated in the Report have no substantiation and were made in an effort to deceive the public to think that the supplements, including Plaintiffs' products, are ineffective and that Celebrex® is a superior treatment for osteoarthritis." (*id.* at 44);

● As a consequence of the statements in the Report, the Study negatively changed the opinion of millions of patients and physicians around the world towards use of the nutritional supplements glucosamine and chondroitin for arthritis pain." (*id.* at ¶46);

● "As a direct and proximate result of Defendants' false statements, the supplements, including Plaintiffs' products, were wrongly disparaged in hundreds of media stories, articles, letters to the editor, on television, the radio, and advertisements, nationally and internationally" which also misled Plaintiffs' customers and potential customers about the efficacy of Plaintiffs' products and finically harmed Plaintiffs." (*id.* at ¶¶47-49).

Defendants stress that the Report "identifies the sources of the glucosamine and chondroitin manufactured specifically for and used in the GAIT study, and clarifies that 'glucosamine and chondroitin sulfate are considered dietary supplements and are not held to the stringent standards of pharmaceutical manufacturers.  Because [the GAIT] Study was conducted under pharmaceutical rather than dietary supplement regulations, agents identical to the ones used [in GAIT] may not be commercially available.'"  (MTD at 12 (quoting the Report at 807)).

Plaintiffs have not disputed that glucosamine and chondroitin are generic compounds and are not, in and of themselves, proprietary property of Plaintiffs.  The Report is clear that the glucosamine and chondroitin utilized for the Study was conducted under pharmaceutical regulations and may not be commercially available. The Report was also abundantly clear that it did not use glucosamine and chondroitin that were considered to be identical to readily available supplements.  However, the Report did call into question the effectiveness of the supplements specifically used in the Study and, arguably in general, for treating osteoarthritis of the knee.  Nonetheless, on the facts alleged, Plaintiffs are not like the plaintiffs in *Seitz* who "invented" the very product that the defendant allegedly impugned.  *Seitz,* 544 F.Supp.2d  at 909 ("Considering Plaintiffs' status as the inventor of [the product at issue]. . . reasonable minds could find that the general statements about [the product] were directed at Plaintiffs' products.").  "The plausibility standard [by which a motion to dismiss is gauged] is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 570).  Here, Plaintiffs' allegations simply do not provide the necessary bridge by which to reasonably conclude that the statements concern Plaintiffs' products in particular.  A complaint cannot survive dismissal where the court can only infer that a claim is merely possible rather than plausible. *Iqbal*, 556 U.S. at 678.  Count II should be dismissed for failure to state a claim.  Moreover, Plaintiffs' proposed amendments in no way cure the pleading deficiencies with regard to Count II.  Plaintiffs Motion for Leave to Amend should be

1    denied to the extent they seek to add allegations in support of a claim of commercial

2    disparagement.

3            **3.    DEFENDANTS' ASSERTION OF QUALIFIED PRIVILEGE UNDER THE**

4            **FIRST AMENDMENT**

5            Defendants argue that even if Plaintiffs are able to state a claim in Counts I and II,

6    the claims would still fail under the First Amendment Qualified privilege.  (MTD at 13-

7    15).  Plaintiffs counter that Defendants are not entitled to the privilege in light of

8    Plaintiffs' allegations that Defendants republished the allegedly false statements and

9    acted with an evil hand, in their own self-interest, with the intent to harm Plaintiffs.

10   (Plaintiffs' Opp. at 9).  Because Plaintiffs have adequately stated a claim of defamation as

11   to Dr. Theodosakis, the analysis turns to the issue of privilege.

12           As a defense to a claim of defamation, the Arizona courts have recognized

13   absolute and qualified privileges protecting "'conduct which otherwise would be

14   actionable. . . [when] the defendant is acting in furtherance of some interest of social

15   importance, which is entitled to protection even at the expense of uncompensated harm to

16   the plaintiff's reputation.'"  *Green Acres Trust v. London,* 141 Ariz. 609, 612, 699 P.2d

17   617, 620 (1984) (quoting Prosser, *Law of Torts,* (4th ed. 1971) § 114, p.776) (footnote

18   omitted in original).  Defendants rely on the "Common Interest" qualified privilege,

19   which "applies where an occasion arises in which 'one is entitled to learn from his

20   associates what is being done in a matter in which he has an interest in common with

21   them.' Restatement (Second) of Torts § 596, Comment c."  *Id.* 141 Ariz. at  617, 688

22   P.2d at 625.  A qualified privilege "differs from the defense of absolute privilege in that

23   'the interest which the defendant is seeking to vindicate is regarded as having an

24   intermediate degree of importance, so that the immunity conferred is not absolute, but is

25   conditioned upon publication in a reasonable manner and for a proper purpose.  Absent a

26   proper purpose or reasonable manner of publication, the defense fails."  *Id.* at 615, 688

27   P.2d at 624 (internal quotation marks and citation omitted).  In sum, "[t]he privilege

28   give[s] protection from liability only when exercised for the purpose for which [it] is

given and with reasonable care that no more harm shall be done to the interests of others than is necessary to accomplish the end for which the privilege is given." *Id.* (internal quotation marks and citation omitted).

When the defense of a qualified privilege is raised, "[t]he court must first determine whether a privileged occasion arose, and, if so, whether the occasion for the privilege was abused." *Id.* (citation omitted). The first inquiry is a question of law, and the second is a question for fact for the jury. *Id.* To establish that a privileged occasion arose, the defendant must establish that the circumstances in which the communication was made created an obligation to speak. *Id.* Once the defendant has demonstrated "that a conditional privilege may apply, the plaintiff may then prove an abuse of that privilege either by proving publication with "actual malice" or by demonstrating excessive publication. *Id.*

Defendants contend that the Report qualifies for the common interest privilege given that "'scholarly activity generally fits within the common interest privilege.'" (MTD at 13 (quoting *Critical Care Diagnostics, Inc. v. American Ass'n for Clinical Chemistry, Inc.,* 2014 WL 634206 (S.D. Cal. Feb. 18, 2014)). In *Critical Care Diagnostics,* the court extended the common interest privilege to an article which was based on peer-reviewed research, published "in a well-respected scientific journal[]," and "was directed to an interested audience and not to the general population. The author defendants, through the publisher of the scholarly journal and the editor of the journal, presented their findings to an audience that shared their scholarly interests and activities." 2014 WL 634206 at *6. There can be no question that the NEJM "is a widely renowned medical journal published for educational purposes and for the benefit of the medical field." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.,* 627 F.Supp.2d 385, 457 (D.N.J. 2009).[11] The Report's publication in the NEJM falls within the common interest privilege.

---

[11] The Second Circuit has recognized that
it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent

To proceed with their defamation claim, Plaintiffs must sufficiently allege that Defendants abused the "privilege by demonstrating the existence of either excessive publication or actual malice." *Burns v. Davis,* 196 Ariz. 155, 164, 993 P.2d 119, 1128 (App. 1999) (citing *Green Acres Trust,* 141 Ariz. at 616, 688 P.2d at 624). "Abuse through excessive publication results from publication to an unprivileged recipient not reasonably necessary to protect the interest upon which the privilege is grounded." *Green Acres Trust,* 141 Ariz. at 616, 688 P.2d at 624 (citation omitted). "An abuse through 'actual malice' occurs when the defendant makes a statement knowing its falsity or actually entertaining doubts about its truth." *Id.* (citation omitted).

Plaintiffs essentially allege in the FAC that the raw data did not support the published findings and, consequently, "the statements made by Defendants in the Report were facially false[]" and were harmful to Dr. Theodosakis' reputation. (FAC at ¶¶30, 34; *see also id.* at ¶¶39-44, 54). Plaintiffs also allege that Dr. Clegg was financially involved with the maker of Celebrex® and Specialty Pharmaceuticals and McNeil Consumer who also competed with Plaintiffs, and Dr. Sawitzke was financially involved the maker of Celebrex®. (FAC at ¶¶35, 36). Plaintiffs also allege that "Defendants acted with an evil hand guided by an evil mind, in their own self-interest, with the intent to harm Plaintiffs. Defendants consciously pursued the above course of conduct knowing that it created a

---

inferences about the nature of reality based on the results of experimentation and observation. Importantly, those conclusions are presented in publications directed to the relevant scientific community, ideally in peer-reviewed academic journals that warrant that research approved for publication demonstrates at least some degree of basic scientific competence. These conclusions are then available to other scientists who may respond by attempting to replicate the described experiments, conducting their own experiments, or analyzing or refuting the soundness of the experimental design or the validity of the inferences drawn from the results. In a sufficiently novel area of research, propositions of empirical "fact" advanced in the literature may be highly controversial and subject to rigorous debate by qualified experts. Needless to say, courts are ill-equipped to undertake to referee such controversies. Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury.

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496-97 (2d Cir. 2013). Although this observation was not made in the context of the common interest privilege, it nonetheless informs the instant discussion.

- 28 -

substantial risk of harm to Plaintiffs, thus entitling Plaintiffs to an award of punitive damages." (FAC at ¶59).

Plaintiffs' allegations concerning Defendants' financial involvement with the maker of Celebrex® and other companies in direct competition with Plaintiffs' products, the favorable findings with regard to celecoxib over glucosamine and chondroitin together with Dr. Altman's statements that the raw data indicated celecoxib did not perform as indicated, reasonably support the inference that Defendants abused the privilege with actual malice.   Because Plaintiffs' allegations are sufficient to rebut application of the common interest privilege at this point, the defamation claim with regard to Dr. Theodosakis can proceed.

Additionally, the PSAC adds the following allegations:

● "Following publication of the Report, Defendants Clegg and Sawitzke re-published the false statements concerning the alleged failed efficacy of glucosamine and chondroitin in interviews, journals and magazines, which were disseminated to the general public in paper form and on the internet (hereinafter referred to as the 'Other Statements')." (PSAC at ¶36)

● "[I]n 2006, Defendant Clegg said in a prepared statement concerning the GAIT Study. . . that '[f]or the study population as a whole, supplements were found to be ineffective' and '[a]s we expected, patients who took celecoxib showed significant improvement in pain relief.'   Dr. Clegg's remarks were re-published in various news articles to the general public in print and on the internet, including Science Daily." (*id.* at ¶37);

● "Defendant Sawitzke republished the false statements concerning the GAIT Study. . . in an article he authored that was published in Arthritis & Rheumatism 2008." (*id.* at ¶38).

The allegations that Dr. Clegg republished the statements "to the general public" in Science Daily also lends support to the inference that the privilege does not apply. While Plaintiffs do not allege that Dr. Sawitzke's republication went to the general

public, the matter of his republication is at least relevant to the Lanham Act claim, as discussed *infra*.  Thus, contrary to Defendants' assertions, these additional allegations are not futile and should be allowed.

        **4.**     **COUNT III:  TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

      Defendants argue that Plaintiffs allegations are too conclusory to state a claim in Count III.

      Plaintiffs allege that they "had business expectancy with respect to their products and the market therefor[]" and that Dr. Theodosakis had contractual consulting relationships with Rexall and Pharmavite and had business expectancy to such contractual relationships.  (FAC at ¶¶70-71).  According to Plaintiffs, Defendants knew or should have known of Plaintiffs' business expectancies prior to publication of the Report, and Defendants intentionally interfered with Plaintiffs' business expectancies and/or caused termination of same.  (*Id.* at ¶¶73-74).

      "[A] plaintiff asserting a claim of tortious interference with a business expectancy must allege (1) the existence of a valid business expectancy; (2) the interferer's knowledge of the business expectancy; (3) the interferer intentionally induced or caused termination of the business expectancy; and (4) damage suffered as a result of termination of the business expectancy."  *Dube,* 216 Ariz. at 412, 167 P.3d at 99 (citation omitted).  Further, "the intentional interference must be a [w]rongful interference [that] rests on improper conduct by the defendant ... not on whether a breach [or termination of the expectancy] followed."  *Id.* (internal quotation marks and citation omitted).

      Defendants are correct that Plaintiffs have alleged no factual basis that would plausibly support the claim that Defendants were aware of Plaintiffs' alleged business relationships.  Without awareness of the relationships, it cannot plausibly follow that Defendants could have intentionally interfered with those relationships. *See id.* at 413-14, 167 at 100-01 (the plaintiff must identify the precise relationship with which the defendant interfered and the interference must be intentional).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice[]" to state a claim. *Iqbal*, 556 U.S. at 678. Nor does Plaintiffs' reliance on "information and belief", in and of itself, convert conclusory allegations into non-conclusory ones. "[A]lthough allegations 'upon information and belief' may state a claim after *Iqbal* and *Twombly*, a claim must still be based on factual content that makes liability plausible, and not be 'formulaic recitations of the elements of a cause of action.'" *Klohs v. Wells Fargo Bank, N.A.*, 901 F.Supp.2d 1253, 1260 n.2 (D.Haw.2012) (quoting *Long v. Yomes*, 2011 WL 4412847, at *4 (D.Haw. Sept. 20, 2011) (quoting *Twombly*, 550 U.S. at 555)); *see also Solis v. City of Fresno*, 2012 WL 868681, at *8 (E.D.Cal. Mar. 13, 2012) ("In the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim."). "The facts alleged must be sufficient to nudge the claims 'across the line from conceivable to plausible.'" *Solis*, 2012 WL 868681, at *8 (quoting *Twombly*, 550 U.S. at 547); *see also Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 989 (D. Ariz. 2015) (same); *Tesi v. ReconTrust NA*, 2013 WL 2635613, *4 (D.Ariz. June 12, 2013) (same).

Plaintiffs' attempts to amend the FAC on this point are to no avail. Again, Plaintiffs reliance "[o]n information and belief" (*see* PSAC at ¶¶39-40, 42), without more, are too conclusory to state a claim tortious interference with business expectancy. Plaintiffs' Count III should be dismissed for failure to state a claim and Plaintiffs' Motion for Leave to Amend should be denied to the extent that Plaintiffs seek leave to amend this claim.

**5.    COUNT IV: FALSE ADVERTISING AND UNFAIR COMPETITION UNDER THE LANHAM ACT**

The Lanham Act creates a federal cause of action against any person who is responsible for false advertising used in interstate commerce that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To constitute commercial advertising or promotion under the Lanham Act, a representation must be:

> 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations 4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Rice v. Fox Broad. Co.,* 330 F.3d 1170, 1181 (9th Cir. 2003) (quoting *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir.1999)).   Defendants argue that Plaintiffs cannot state a claim under the Lanham Act because the statements at issue do not constitute commercial speech under the Act.

"Neither the [Lanham] Act's legislative history nor the Act itself defines 'advertising' or 'promotion.'"  *Coastal Abstract Serv., Inc.,* 173 F.3d at 734.  The Ninth Circuit has recognized that "[t]he core notion of commercial speech is 'speech which does no more than propose a commercial transaction.'" *Rice,* 330 F.3d at 1181 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422  (1993)).  Further, "[i]f speech is not 'purely commercial'—that is, if it does more than propose a commercial transaction—then it is entitled to full. . ." protection.  *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 906 (9th Cir. 2002) (quoting *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1185-86 (9th Cir. 2001)); *see also Hunt v. City of Los Angeles,* 638  F.3d 703, 715 (9th Cir. 2011) ("Commercial speech does not retain its commercial character 'when it is inextricably intertwined with otherwise fully protected speech.'" (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796 (1981)).  Consequently, although the Lanham Act

> is applicable only to "commercial advertising and promotion," it is clear that the law reaches more than the typical advertising campaign. *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 112 (6th Cir.1995) (article written for trade magazine may be classified commercial promotion); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (mailing of informational pamphlets by non-profit organization can be classified commercial speech); *Gordon & Breach* [*Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521, 1534–36 (S.D.N.Y. 1994)]…; *Birthright v. Birthright*, Inc., 827 F.Supp. 1114, 1138 (D.N.J.1993) (non-profit fundraising letters can be commercial

advertising); *National Artists Mgmt. Co. v. Weaving*, 769 F.Supp. 1224, 1234–36 (S.D.N.Y.1991) (former employee's bad-mouthing of employer can fit into category of commercial advertising).

*Oxycal Labs., Inc.,* 909 F.Supp. at 723.  *See also Bracco Diagnostics, Inc.,* 627 F.Supp. 2d at 456 (same).  *Cf. Bolger,* 463 U.S. at 67 n.13 ("That a product is referred to generically does not, however, remove it from the realm of commercial speech.  For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names.  Or, a trade association may make statements about a product without reference to specific brand names.").  At bottom, "[w]here the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Hunt,* 638 F.3d at 715 (citing *Bolger,* 463 U.S. at 60-67); *see also Bolger,* 463 U.S. at 68 n.14 (stressing that not all factors need be present: "Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial.").

The Sixth Circuit has found the primary purpose of speech to be commercial where the defendant, a company president, published in a trade magazine, "an article peppered with advertising for . . . [his company's] products." *Semco, Inc.,* 52 F.3d at 113.  In so holding, the court noted that reference to the specific products was not necessary to the article, and thus, not inextricably intertwined with the subject matter: "[the defendant] could have written precisely what the editor requested, a detailed description and explanation of the new process for manufacturing plunger tips." *Id.* Instead, the defendant's inclusion of a description of his company's "own products, history, quality standards, safety standards, and commitment to customer service[]" promoted the company and invited commercial transactions sufficient to constitute commercial speech. *Id.*

In contrast, the District Court for the District of New Jersey has held that a scientific article published in the NEJM, the same publication at issue in this case, did not

fit the definition of commercial speech. *Bracco Diagnostics, Inc.* 627 F.Supp.2d at 457-58.   The *Bracco* court acknowledge that the NEJM is a "widely renowned medical journal published for education purposes and for the benefit of the medical field." *Id.* at 457.   Although the *Bracco* defendants sponsored the research for the article, the court distinguished *Semco* on the ground that the defendants did not write the article and the author was not paid by the defendants for his work. *Id.*  The court went on to state that "publication [of the article] was not commercial because it did not advocate that the reader purchase a particular product over another, even though it did come to specific scientific conclusions about which products. . . were better suited for certain medical purposes." *Id.*  The court also stated that although the article "widely disseminated in the NEJM's distribution pool, it is a protected form of speech, distributed by an impartial educational journal in the field of medicine." *Id.*  (noting that its conclusion "is supported by a consideration of the chilling effect on speech in the academic and non-profit context that could be the result of allowing actions such as this to proceed.").

Likewise, the District Court for the Southern District of California determined, in denying a motion for preliminary injunction, that a book on cancer awareness did not constitute commercial speech even though the author allegedly had an interest in one of the stores listed in the appendix of the book. *Oxycal Labs., Inc.,* 909 F.Supp. at 726.   Heeding the Supreme Court's statement in *Bolger* that "merely having an 'economic motivation . . . would clearly be insufficient by itself to turn the materials into commercial speech[,]'", the *Oxycal Labs.* court emphasized that that the primary purpose of the plaintiff's book was not to sell products mentioned in the book, but to advance the plaintiff's theories on the causes of cancer and the ways to eliminate cancer. *Id.* at 725-26 (quoting *Bolger,* 463 U.S. at 66-67).

Here, Defendants' argument that this case is akin to *Bracco Diagnostics* is well taken. (*See* MTD at 8).   As stated in *Bracco Diagnostics,* the main focus of the NEJM is for education purposes, nor did the Report "advocate that the reader purchase a particular product over another, even though it did come to specific scientific conclusions . . ."

about the results reached using glucosamine and chondroitin versus celecoxib.  *Bracco Diagnostics, Inc.,* 627 F.Supp.2d at 457.   That Drs. Clegg and Sawitzke may have financial interest in Celebrex®'s manufacturer as well as an interest in other competitors of glucosamine and chondroitin, does not change the analysis.   They were not the only authors, but were two of more than twenty authors.   (*See* the Report at 795).   Even construing Plaintiffs' allegations as true, publication of the Report in the NEJM was for the express purpose of assessing the efficacy of glucosamine and chondroitin for the treatment of osteoarthritis of the knee, not as a means to sell Celebrex®.  *See e.g. Bracco Diagnostics, Inc.,* 627 F.Supp. 2d at 457; *Oxycal Labs,* 909 F.Supp. at 726. Consequently, publication of the Report in the NEJM does not constitute commercial speech for purposes of the Lanham Act.

However, this conclusion does not end the analysis because Plaintiffs argue that Defendants' republication of the statements leaves them open to liability under the Lanham Act.   Plaintiffs are correct that courts have distinguished between the defendant's initial publication of the article and its continued distribution of reprints or republication.  *See e.g., Semco,* 52 F.3d at 114 (defendant distributed a reprint of the article at trade shows); *Bracco Diagnostics, Inc.,* 627 F.Supp.2d at 459-63 (defendant's secondary distribution of the NEJM article constituted a form of commercial speech); *Gordon & Breach,* 859 F.Supp. at 1544-45 (defendant's distribution of reprints of the article at a conference of its targeted audience constituted commercial speech).

Plaintiffs allege that "Defendants published the defamatory and false statements . . . to third parties, including the general public . . . via the [NEJM] and anywhere else the Report was republished, reprinted, distributed, or posted, nationally and internationally, as well as in lectures and interviews, concerning the Study."[12]  (FAC at ¶52).   Other than referring to the NEJM, Plaintiffs do not specifically allege any particular secondary publication or other means by which the Report was republished.

---

[12] Incidentally, this allegation appears under the claim for defamation in Count I, not the Lanham Act count.

Plaintiffs' allegations are too conclusory to establish a claim for secondary publication under the Lanham Act.   Plaintiffs' Lanham Act claim as alleged in the FAC should be dismissed for failure to state a claim.

Plaintiffs seek leave to amend their FAC to, among other things, add the following allegations:

● "Following publication of the Report, Defendants Clegg and Sawitzke re-published the false statements concerning the alleged failed efficacy of glucosamine and chondroitin in interviews, journals and magazines, which were disseminated to the general public in paper form and on the internet (hereinafter referred to as the 'Other Statements')." (PSAC at ¶36);

● "[I]n 2006, Defendant Clegg said in a prepared statement concerning the GAIT Study. . . that '[f]or the study population as a whole, supplements were found to be ineffective' and '[a]s we expected, patients who took celecoxib showed significant improvement in pain relief.'   Dr. Clegg's remarks were re-published in various news articles to the general public in print and on the internet, including Science Daily." (*id.* at ¶37);

● "Defendant Sawitzke republished the false statements concerning the GAIT Study. . . in an article he authored that was published in Arthritis & Rheumatism 2008." (*id.* at ¶38).

Defendants argue that Plaintiffs' claims of other statements fails because the other statements, "like the NEJM Report, were published for educational purposes and for the benefit of the medical field, not for commercial competition or advertising." (Defendants' Opp. (Doc. 78) at 8). However, unlike the Report published in the NEJM where Defendants were two of more than twenty authors, Plaintiffs allegations here are that Dr. Clegg and Dr. Sawitzke, each of whom has an alleged financial interest in the manufacturer of Celebrex®, are continuing to make statements arguably aimed at the medical field, who makes treatment decisions, and the general public touting the Study's results in favor of Celebrex®.   Plaintiffs' allegations advanced in their PSAC are

adequate to state a claim under the Lanham Act.  Because the proposed amendments are not futile, Plaintiffs should be granted leave to amend the FAC on this issue.  *See Cook, Perkiss and Liehe, Inc.,* 911 F.2d at  247 (upon dismissal for failure to state a claim, amendment should be permitted when not futile).

### 6.    COUNT V:  VIOLATION OF ARIZONA'S CONSUMER FRAUD ACT, A.R.S. §44-1522

Plaintiffs allege that Defendants' conduct violated Arizona's Consumer Fraud Act, A.R.S. §44-1522, *et seq.*.  Under Arizona's consumer fraud statute,

> [t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. §44-1522(A).  To succeed on a consumer fraud claim, the "plaintiff must show (1) a false promise or misrepresentation made in connection with sale or advertisement of merchandise, and (2) consequent and proximate injury."  *Stratton v. American Medical Security, Inc.,* 2008 WL 2039313, *7 (D. Ariz. May 12, 2008) (citing *Kuehn v. Stanley,* 208 Ariz. 124, 91 P.3d 346, 351 (Ariz. App. 2004)); *see also Moreno v. Minnesota Life Ins. Co.,* 2015 WL 1457419, *4 (D. Ariz. March 30, 2015) (same).  "The plaintiff must also establish that the defendant acted intentionally.  If the plaintiff complains of an unlawful act, she must show only that the defendant intended the act in question. *State ex rel. Horne v. AutoZone, Inc.*, 275 P.3d 1278, 1281 (Ariz. 2012)  If the plaintiff complains of a material omission, however, she must establish that the omission was 'made with intent that a consumer rely thereon.'  *Id.*"  *Leist v. Acad. Mortg. Corp.*, 2016 WL 1593815, at *4 (D. Ariz. Apr. 20, 2016).

Defendants argue that Plaintiffs "have not pleaded with particularity how Defendants' statements published in a scholarly journal were made 'in connection with the sale or advertisement of any merchandise.'"  (MTD at 18 (quoting *Sutter Home Winer, Inc. v. Vintage Selections, Ltd.* 971 F.2d 401, 407 (9th Cir. 1992)).  Defendants

also argue that Plaintiffs are not consumers and have not alleged any facts showing that they relied on the alleged misrepresentations.  (*Id.*).  Defendants stress that "the NEJM report makes clear that the authors made no promise or misrepresentation in connection with the sale or advertisement of merchandise."  (*Id.* at 19).

Arizona's consumer fraud act "is designed to root out and eliminate 'unlawful practices' in merchant-consumer transactions." *People ex rel. Babbitt v. Green Acres Trust*, 127 Ariz. 160, 164, 618 P.2d 1086, 1090 (App. 1980), *superseded by statute on other grounds as discussed in State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 592, 667 P.2d 1304, 1307 (1983), *superseded by statute on other grounds as discussed in Lifeflite Medical Air Transport, Inc. v. Native American Air Services, Inc*. 198 Ariz. 149, 7 P.3d 158 (App. 2000).  To this end, the Consumer Fraud Act "'provide[s] injured consumers with a remedy to counteract the disproportionate bargaining power often present in consumer transactions.'"  *Moreno,* 2015 WL 1457419 at *6.* (quoting *Shaw v. CTVU Motors, Inc.*, 232 Ariz. 30, 32, 300 P.3d 907, 909 (App. 2013)); *see also Sutter Home Winery, Inc. v. Vintage Selections*, Ltd., 971 F.2d 401, 407 (9th Cir. 1992) ("The clear intent of . . . [Arizona's Consumer Fraud Act] is to protect unwary buyers from unscrupulous sellers.").  Because Plaintiffs' allegations do not suggest that they are consumers subject to Defendants' alleged deception, Count V should be dismissed for failure to state a claim.  *See Sutter Home Winery, Inc.,*  971 F.2d at 407 ("The basis for Vintage's claim, however, is that Sutter Home deceived it by secretly selling to another distributor the exclusive rights to distribute its wine.  Under this scenario, Vintage is not a buyer, nor is it the target of deceptive advertising.  Consequently, it cannot maintain an action under Arizona's Consumer Fraud Act.").  Nor does it appear that Plaintiffs could allege sufficient facts to state a claim under Arizona's Consumer Fraud statute.

## IV.  CONCLUSION

This Court could not agree more with the Second Circuit's observation "that courts are ill-equipped to undertake to referee such [scientific] controversies." *ONY, Inc.,* 720 F.3d at 497.  Instead, "the trial of ideas" should "ideally play[] out in the pages of

peer-reviewed journals," where "the scientific public sits as the jury." *Id.*  However, in some cases, including this one, judicial involvement in such affairs once invoked cannot be avoided, *see e.g. Bracco Diagnostics, Inc.,* 627 F.Supp. 2d 384.  Plaintiffs' allegations are sufficient to allow this matter to proceed as discussed above.

## V. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant in part the Utah Defendant's Motion to Dismiss (Doc. 60) to the extent that:

(1)   Count I, defamation as to Plaintiff Supplement Testing Institute, Inc., only; Count II, commercial disparagement; Count III, tortious interference with business expectancy; and Count V, violation of Arizona's Consumer Fraud Act, should be dismissed with prejudice.

(2)   Count IV, false advertising and unfair competition under the Lanham Act, should be dismissed without prejudice with leave to file and serve a Second Amended Complaint.

The Magistrate Judge further recommends that the Utah Defendants' Motion to Dismiss (Doc. 60) be denied on all other grounds.

The Magistrate Judge further recommends that the District Court, after its independent review, grant in part Plaintiffs' Motion to for Leave to Amend (Doc. 75) to the extent that Plaintiffs may file and serve a Second Amended Complaint consistent with this Report and Recommendation.  In light of the separate Report and Recommendation addressing the United States and Dr. Reda's Motion to Dismiss, any Second Amended Complaint shall omit all claims against the United States and Dr. Reda.

Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District of Arizona, any party may serve and file written objections within **FOURTEEN (14) DAYS** after being served with a copy of this Report and Recommendation.  A party may respond to another party's objections within **FOURTEEN (14) DAYS** after being served with a copy.

Fed.R.Civ.P. 72(b)(2).  No replies to objections shall be filed unless leave is granted from the District Court to do so.  If objections are filed, the parties should use the following case number: **CV 14-2445-TUC-JAS**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to review.

Dated this 30th day of January, 2017.

Bernardo P. Velasco
United States Magistrate Judge